**Arlene S. KAGANOVE, Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Lee Thomas, Administrator; Valdas V. Adamkus, Regional Administrator, Defendants.**

No. 86 C 5795.

United States District Court,
N.D. Illinois, E.D.

June 16, 1987.

Michael Seng, Chicago, Ill., for plaintiff.

Barbara Freeman Lazarus, Asst. U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Arlene S. Kaganove filed this complaint for injunctive relief under the Freedom of Information Act ("FOIA"), 5 U.S.C.A. § 552 (West Supp.1987). Kaganove seeks release of information from the United States Environmental Protection Agency ("EPA"). Currently before the Court are the parties' cross-motions for summary judgment. For the reasons noted below, we deny defendant EPA's motion for summary judgment and grant plaintiff Kaganove's motion for summary judgment.

I.

In April of 1986, Kaganove submitted a written FOIA request for a copy of the Merit Promotion Rating Plan used for Vacancy Announcement Number 85–47, Supervisory Environmental Protection Specialist, GM–028–13 ("Rating Plan"). The requested record is a two-page form containing (1) the job vacancy announcement number, (2) the job title, (3) four rating factors (descriptions of the knowledge, skills and abilities required for satisfactory job performance), (4) a numerical weight value for each rating factor and (5) one sentence descriptions of the levels of knowledge, skills and abilities needed to achieve a point value of 1 to 4 with a 4 awarded for the highest level of experience.

On April 16, 1986, the EPA essentially denied Kaganove's request on the ground that the information was exempt under 5 U.S.C. § 552a(k)(6), the Privacy Act. This section allows the head of an agency to promulgate rules to exempt records on testimony or examinations "used solely to determine individual qualifications for appointment or promotion in the federal service, the disclosure of which would compromise the objectivity or fairness of the testing or examination process...." 5 U.S.C. § 552a(k)(6). The EPA claims that it only partially denied Kaganove's request by releasing a redacted rating plan that revealed only information already public. The various numerical weight values for each rating factor and the one sentence descriptions for point value levels were redacted. Because the EPA failed to meet the time limits on Kaganove's appeal, she is deemed to have exhausted her administrative remedies under 5 U.S.C. § 552(a)(6)(C) and is entitled to bring the present action for relief.

The EPA attempts to characterize Kaganove's request as a purely personal request to seek information used to deny her a promotion. Kaganove contends that, although it is true that she did apply for the position the rating plan applied to, her request for this information is to demon-

strate policy decisions made by EPA personnel as reflected in the promotion selection process for EPA personnel. We do not think plaintiff's personal reasons for requesting information under the FOIA is relevant to our analysis since, as discussed below, we find that the requested information concerns a matter of significant public interest.

Rating plans similar to the particular one at issue in this case are used to fill internal vacancies in the EPA. When a vacancy is to be filled through merit promotion procedures, a merit promotion "Vacancy Announcement" is published by posting it in public areas within the EPA, Region V, and by other means of publication. The announcement identifies the announcement number, position title, grade and related information. In addition, the vacancy announcement identifies the knowledge, skills and abilities determined by the EPA personnel as needed for satisfactory performance of the job. The knowledge, skills and abilities are set forth in the rating plan as the "rating factors." The relative value of each of the various "rating factors" is measured by a factor weight. Kaganove seeks release of the factor weights for each of the rating factors for the Vacancy Announcement Number 85–47.

The rating plan also breaks each of the "rating factors" into four possible skill, experience and knowledge levels. Each level is assigned a numerical point value of 1 to 4. Four points are awarded to the highest level of skill, experience and knowledge, and one point is awarded for the lowest level of skill, experience and knowledge. Each point level consists of a one-sentence description of the skill, experience and knowledge necessary for an applicant to achieve that particular point level. Kaganove also seeks release of this information, that is, the one sentence descriptions of the point value levels.

Kaganove has attached to her cross-motion a sample rating plan for the position of Supervisory Interdisciplinary Engineer Sci-

entist.[1] We will use this rating plan as example of the type of information that is being sought in this case. For example, for this position, the EPA identified seven different rating factors. The first rating factor is "knowledge of hazardous waste management technology" and is given a factor weight of 3. This rating factor is then broken down into four point levels:

*Four Points:* Experience performing technical adequacy reviews of hazardous waste storage permit applications *and* either (1) experience performing geological or civil engineering reviews of land disposal permit applications or (2) chemical engineering/chemistry reviews of incinerator permit applications.

*Three Points:* Experience performing technical adequacy reviews of hazardous waste storage permit applications *and* either (1) experience performing general technical reviews of land disposal permit applications or (2) general technical reviews of incinerator permit applications.

*Two Points:* Experience performing technical adequacy reviews of any hazardous waste management permit applications.

*One Point:* Anything less than for 2 points.

(Plaintiff's Exhibit H). It is these one-sentence descriptions under each rating factor that Kaganove seeks for Vacancy 85–47.

The personnel individual charged with rating an applicant's application for the vacancy evaluates the applicant's past skills, experience and knowledge and assigns an appropriate point level to the candidate for each rating factor. For example, for someone with none of the experiences required for point levels 2 through 4 but who had some knowledge of hazardous waste technology, he or she is assigned 1 point. The 1 point is then multiplied by the factor weight which represents the EPA decision as to the relative value of each factor assigned to rating factor 1. Kaganove also seeks release of these factor weights on Vacancy 85–47. In this case,

---

1. This is not the specific rating plan at issue here. The EPA, however, does not deny the validity of this rating plan as an example.

the factor weight is 3. Thus, our hypothetical applicant with a little knowledge of hazardous waste management technology would end up with a point value of 3 for rating factor 1. This process would continue for the remaining six rating factors. The scores for all the rating factors are added and then divided by the sum of the factor weight values. The result, a score of 1 to 4, is the applicant's average point score in the merit promotion process. Applicants with an average of 3 or more points are certified as highly qualified. Those with fewer than three points are considered qualified. Generally, highly qualified candidates are customarily referred to the selecting official for further consideration for the position. Qualified candidates may not necessarily be referred for further consideration.

## II.

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, Rule 56(c) requires the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

When Congress enacted the Freedom of Information Act, its goal was to replace the inadequate public disclosure provisions of the Administrative Procedure Act. Congress therefore structured the FOIA to reflect " 'a general philosophy of full agency disclosure unless information [was] exempted under clearly delineated statutory language.' " *Department of Air Force v. Rose*, 425 U.S. 352, 361–62, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976). There are nine statutory exemptions to the FOIA, and these exemptions are to be narrowly construed so as to support the basic policy of the act to disclose and not to withhold. *Id.* Thus, the burden to show that requested information is covered by an exemption rests squarely upon the government. With these guidelines in mind, we turn to examine the EPA's claimed exemption.

## A.

Although the EPA initially denied Kaganove's request under 5 U.S.C. § 552a(k)(6) of the Privacy Act, it now abandons that ground and seeks exclusion directly under a FOIA exception, 5 U.S.C. § 552(b)(2) ("Exemption 2") which exempts from disclosure matters "related solely to the internal personnel rules and practices of an agency." *Id.* Unlike other exemptions, "Exemption 2 is the only exemption in the FOIA having a conceptual underpinning totally unrelated to any harm caused by disclosure *per se;* rather, it is aimed at avoiding the sheer administrative burden that can be imposed by the FOIA processing." R. Bouchard, *Guidebook to the Freedom of Information and Privacy Acts 1985 Supplement* 23 (1985). The "general thrust of the exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest." *Department of the Air Force*, 425 U.S. at 370, 96 S.Ct. at 1603.

Despite the EPA's total failure to cite or mention it, we are guided and bound by the Supreme Court's decision in *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), the only case in which the Court has had occasion to construe the policies and purposes behind Exemption 2. In *Department of the Air Force*, present and former law review editors sought disclosure from the Air Force of case summaries of honor and ethics hearings at the Air Force Service Academy with personal references and other identifying material deleted. The editors were researching disciplinary systems and procedures at the military service academies for a law review article. The Air Force denied

the FOIA request order Exemptions 2 and 6. 5 U.S.C. § 552(b)(2), (6). In construing Exemption 2, the Supreme Court examined its legislative history. It found that the House and Senate Reports on the bill finally enacted differed upon the scope of Exemption 2. The Senate Report stated:

> Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like.

*Department of the Air Force*, 425 U.S. at 364, 96 S.Ct. at 1600 (citing S.Rep. No. 813, p. 8). The House Report, on the other hand, declared:

> 2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions and routine administrative procedures which are withheld under the present law.

*Id.* (citing H.R.Rep. No. 1497, p. 10). In deciding that the Senate report more closely represented congressional intent, the Court recognized that the narrower Senate version supported the principal purpose of the FOIA in that it favored disclosure, and it was also the only committee report before both houses of Congress. *Id.* at 367, 96 S.Ct. at 1601. The Supreme Court did leave open the issue of whether Exemption 2 might permit "withholding of matters of some public interest ... where necessary to prevent the circumvention of agency regulations that might result from disclosure to the subjects of regulation of the procedural manuals and guidelines used by the agency in discharging its regulatory function." *Id.* at 365, 96 S.Ct. at 1600, finding that this was the primary focus behind the House Report. *Id.* at 367, 96 S.Ct. at 1602.

**B.**

The first requirement for application of Exemption 2 is that the requested information "relate solely to the internal personnel rules and practices of an agency." The Supreme Court in *Department of the Air Force* indicated that Exemption 2 is not applicable to "matters subject to 'a genuine and significant public interest.'" 425 U.S. at 370, 96 S.Ct. at 1603. Thus, even if the requested information in this case did pertain to internal personnel rules and practices, if it is subject to a genuine and significant public interest than it does not come within the ambit of Exemption 2.[2] The EPA contends that, because the requested information is not concerned with "regulating the behavior of the public," it is of no significance to the public. We disagree. The Supreme Court rejected the identical argument in *Department of the Air Force.* In that case, the District Court had concluded that, because the Honor and Ethics Codes "'by definition ... are meant to control only those people in the agency ... the operation of the Honor Code cannot possibly affect anyone outside its sphere of voluntary participation which is limited by its function and its publication to the Academy.'" *Id.* at 368, 96 S.Ct. at 1602. The Supreme Court rejected that position and indicated that a court must inquire whether the information, despite its ostensible internal application, may still be the subject of genuine and significant public interest. The Court concluded that the Academy's administration of discipline had a very significant impact on the public because it directly related to the ability of the military to perform its function. Therefore, before we go any further, we must determine whether the information sought to be released may be the subject of "genuine and significant public interest."

The EPA in its reply memorandum further argues that the content of the rating plans at issue here, while having some public interest, does not raise to the level of public interest necessary to be a matter of

---

**2.** Provided that release would not risk circumvention of agency regulations or statutes. *See* below.

significant public interest. EPA cites *National Treasury Employees Union v. U.S. Customs Service*, 802 F.2d 525 (D.C.Cir. 1986) ("*NTEU*") for the proposition that evaluative criteria used by personnel departments only have some impact on the public but not enough to be significant. However, *NTEU* involved only appointments of entry level and lower level federal employees, and the court only found that "the appointments of individual members of the lower federal bureaucracy is primarily a question of internal significance for the agencies involved." *Id.* at 531. In this case the information sought refers to only one position, Supervisory Environmental Protection Specialist, a GS–13 level position. Additionally, Kaganove presents very convincing evidence, evidence not present in *NTEU*, that information she seeks has a significant public interest.

Because it is such a highly decentralized agency, entrusted with the execution of a myriad of statutes, not all of which interrelate, a few years ago the EPA recognized the need to develop EPA personnel with agency-wide experience. This need was recognized by the current administrator of the EPA, Lee Thomas, in his letter distributing an EPA concept paper in which he introduced his new FAME Program. He indicated that one of the keys to the effectiveness and continued vitality of the EPA was to "make the EPA the kind of place that attracts, develops, and retains quality people." (Plaintiff's Exhibit C). The FAME Program, Framework for Achieving Managerial Excellence, had as one of its key objectives the need to "[d]evelop executives, managers, and supervisors who have an Agency-wide perspective." It also introduced a new EPA policy that would emphasize a preference to promote people with diverse experiences who would bring an agency-wide perspective to EPA decision making.

The interrelationship between the agency's policies and its public responsibilities was also emphasized in a report submitted to the EPA in May 1984 by a panel of the National Academy of Public Administration ("NAPA"). That report made the following conclusions regarding EPA personnel needs:

EPA's effectiveness in its complex mission will continue to depend on its employees. It is accordingly a matter of highest priority that talented employees continue to be attracted, motivated, and retained. They also must be developed and managed along lines supportive of the Agency's programs, which increasingly involve the coordination and oversight of complex inter-governmental regulatory arrangements in which state and local officials make the site-specific decisions. They must be led, at the senior career level, by managers sensitive both to the professionalism and objectivity the public demands of the EPA and the legitimate policy views of elected political leadership. And EPA must have personnel and budget processes consistent with these needs and with the need to translate policy into specific goals and resources that give direction to its talented staff. *In our judgment, EPA must undertake major efforts to improve the management of its people.* (Plaintiff's Exhibit D at 7.)

One of the panel's key recommendations was for the EPA to undertake a comprehensive and coordinated career development and executive development effort on behalf of its employees, because it found that "[m]any EPA employees are currently prisoners of their career specialties and their geographic location. A fundamental objective of the Agency's career development and training should be the removal of barriers to functional and geographic mobility. [It also found] that the EPA does not encourage aggressively enough the Agency-wide experience that is needed in top career managers." *Id.* at 3. The EPA does not dispute the validity of this evidence, only the legal conclusions to be drawn therefrom.

An examination of the sample rating plan Kaganove has submitted to this Court demonstrates Kaganove's point exactly, the plan indeed is biased in favor of those with experience in the department area against those without such experi-

ence.[3] The rating plan has seven rating factors, as detailed above. An examination of the first two rating factors reveals this built-in bias in favor of career specialists. The first factor is labeled, "knowledge of hazardous waste management technology." The non-disclosed point level descriptions which are at issue[4] for 4, 3 and 2 points require some type of hazardous waste experience. This seems reasonable enough for a hazardous waste position, and the one sentence descriptions require only that an applicant have experience in the area, not that they actually had a hazardous waste position. Although, if an applicant had such a position, he would most likely have the proper experience. But the content of this particular non-disclosed point level description reveals nothing that is not expected, after all, the rating factor is titled "knowledge of hazardous waste management technology." What is not expected, and what does clearly reflect a bias in favor of "career specialists" is the non-disclosed point level descriptions that appear under the second rating factor, "knowledge of pollution control legislation, regulations and standards." The label of this rating factor does not seem to relate to any specific program, and, ideally, it would seem to be the perfect opportunity for those applicants from outside the hazardous waste area to score points for general experience gained in other positions. However, the point value description for 4 points, the highest number of points, states that it is only to be given if the applicant has "[e]xperience in the federal, or a state, *hazardous waste management program,* in a position where extensive knowledge of legislation, regulations and standards was required." (Plaintiff's Exhibit H). The point level description for 3 points is exactly the same as that for 4 points except that it does not require a former position in a

hazardous waste management program. Thus, those applicants who are already in, or were previously in, a hazardous waste position can get the highest number of points. This clearly demonstrates Kaganove's position. We agree with Kaganove that in this case, because of the complexity of the EPA's mission, the recognition by its own director of the need for EPA managers with agency-wide experience and the findings of the NAPA panel, it is a matter of significant public interest whether the EPA is actively promoting those with agency-wide experience.

### C.

Because Kaganove has demonstrated that the information she seeks is not solely related to the internal personnel practices of the EPA and is a subject of significant public interest, the EPA in order to withhold this information must show that this information fits within the category of information the Supreme Court referred to as possibly withholdable despite its public interest, that is, information that if released might result in circumvention of agency regulations or statutes. This is the EPA's principal argument in their motion for summary judgment.

■ The EPA cites a line of District of Columbia Circuit Court of Appeals cases which it claims supports its position that the requested information is exempt. The key case in this line is *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051 (D.C.Cir.1981) (en banc). The D.C. Circuit developed a two-prong test to be applied to Exemption 2 claims. That test asks (1) whether the document meets a test of predominant internality and (2) whether disclosure would significantly risk circumvention of agency regulations or statutes. *Id.* at 1074. The *Crooker* test was a re-

---

**3.** The rating plan for "Supervisory, Interdisciplinary Engineer/Scientist 86–15" appears to be for a position in the hazardous waste area, although it is not that clear. We, however, will proceed on that assumption.

**4.** This rating plan is not the rating plan at issue in this case, but because its authenticity as an example of rating plans used by EPA Region V is not contested, we take it as evidence of all

such plans. The EPA could have submitted the plan at issue to the Court for *in camera* inspection, but chose not to do so. Nor does the EPA contend that this rating plan is unique. Rather, it submitted an affidavit from a personnel specialist which indicated that these rating plans frequently use the exact same criteria for different job openings.

sponse to the difficulties that had arisen in applying the language of Exemption 2 to particular cases. In *Crooker* itself, for example, the plaintiff had sought the release of portions of an agent's training manual from the Bureau of Alcohol, Tobacco and Firearms ("BATF"). The requested material consisted of instructions to the BATF agents on the conduct of their official duties. The *Crooker* court found that release of portions of the training manual would risk circumvention of agency regulations by those people who the agency is set up to regulate. *Crooker*, 670 F.2d 1051, 1073 (D.C.Cir.1981). It is this type of circumvention, that is, circumvention by those people who the agency regulates, that the Supreme Court referred to when it identified the concerns demonstrated by the House Report. Accordingly, we think *Crooker* correctly allowed the BATF to use Exemption 2. The EPA, however, in this case first argues that the requested material is exempt under Exemption 2 because disclosure would risk circumvention of agency regulations which provide for the non-disclosure of such material. The EPA does not contend that release of this information would allow the subjects of EPA environmental regulations to circumvent EPA regulations. We do not think that it is this type of agency regulation circumvention that the Supreme Court indicated may provide justification for exemption under Exemption 2. Otherwise, as the court in *National Treasury Employees Union v. U.S. Customs Service*, 802 F.2d 525, 530 (D.C.Cir.1986) ("*NTEU*"), noted, "[i]f such a regulation were sufficient, the result would be a de facto abdication by the courts of their responsibility to review *de novo* agency actions withholding documents." *Id.* In order to suppress information, an agency would need only to pass a rule stating the information should not be released. What a court must do in this context is to determine whether the release of the requested information risks circumvention of some statute or regulation other than the one designating the materials as confidential.

The EPA next argues that either 5 U.S.C. § 2301(b)(1) or § 2302(b)(6) would be circumvented by release of this information.[5]

■ The EPA claims that release of the information in this case will violate this statute because there will not be a fair and open competition for merit positions. We disagree. Although the EPA reads *NTEU* as holding that release of a crediting plan used by Customs to members of the lower level federal bureaucracy, *NTEU*, 802 F.2d at 531, would violate § 2301(b)(1), we do not agree that *NTEU* held that at all. A careful reading of the *NTEU* opinion reveals that the court in *NTEU* specifically found that "[Customs] cannot ... rely on *a specific statute* or regulation ..." *Id.* at 530, and then proceeded to judicially legislate a new exemption into the FOIA. The new exemption was to apply whenever "disclosure would quickly render those documents obsolete for the purpose for which they were designed." *Id.* The language the EPA cites that it claims amounts to a holding that release of such information would violate § 2301(b)(1) refers only to the court's conclusion that a *principle* of the merit system as set forth in § 2301(b)(1) would be violated. While this language seems to indicate that § 2301(b)(1) is being violated, it is clear by the court's plain statement that Customs could not rely on a specific statute and its creation of a new exemption that the court did not find that the violation of a principle in § 2301 amounted to a violation of that statute. Nor would we find that § 2301(b)(1) would be violated other than in spirit. The only way a person can violate § 2301 would be to do so by violating another statute,

5. Section 2301(b)(1) provide:
(b) Federal personnel management should be implemented consistent with the following merit system:
(1) Recruitment should be from qualified individuals from appropriate sources in an endeavor to achieve a work force from all segments of society, and selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity.
5 U.S.C.A. § 2301(b)(1) (West Supp.1987).

§ 2302(b)(11), which provides that no employee with authority shall "take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title." 5 U.S.C. § 2302(b)(11). Thus, in order to violate the merit system principles enunciated in § 2301, one must take or fail to take a personnel action that if taking or failing to take violates some other law, rule or regulation that concerns the principles. This construction of the statute is supported by the language used in § 2301. Section 2301 sets forth the principles of the federal merit system, and Congress used directory rather than mandatory language to set forth these principles. Section 2301 refers to principles that agencies "should" strive to achieve, such as the "work force should be used efficiently" § 2301(b)(5) and "[e]qual pay should be provided for work of equal value," § 2301(b)(3). All of the principles set forth in § 2301(b) use "should" instead of "shall." This is in sharp contrast to the language in § 2302 "Prohibited personnel practices," which is mandatory: "Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, *shall* not, with respect to such authority" do any of the prohibited personnel practices. § 2302(b). Therefore, we find that the EPA cannot rely on a risk that 5 U.S.C. § 2301(b)(1) would be circumvented by release of the requested information to justify its withholding of that information.

■ The next statute the EPA argues could be violated by release of the requested information is 5 U.S.C. § 2301(b)(6). We again disagree. That section makes it a prohibited personnel practice to grant a preference to any employee or applicant for the "purpose of improving or injuring the prospects of any particular person for employment." 5 U.S.C. § 2302(b)(6). § 2302(b)(6) provides:

(b) Any employee who has authority to take, direct others to take, recommend,

or approve any personnel action, shall not, with respect to such authority—

\* \* \* \* \* \*

(6) grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements of any position) for the purpose of improving or injuring the prospects of any particular person for employment.

Even assuming that release of this information would assist anyone in seeking a position, it is clear that by responding to a valid FOIA request, they would only be granting such a preference "authorized by law." If EPA personnel would attempt to manipulate the FOIA process to benefit a particular individual, then they may be violating § 2302(b)(6).

Accordingly, as discussed above, the EPA has failed to demonstrate that release of this information would risk circumvention of either (a) an agency regulation or (b) a statute.

### D.

The only justification left the EPA for the denial of disclosure is the newly-created exemption in *National Treasury Employees Union v. U.S. Customs*, 802 F.2d 525 (D.C.Cir.1986). In *NTEU*, the court created an exemption to be applied when release of the information would render the documents obsolete for the purpose for which they were designed. *NTEU*, 802 F.2d at 530. The EPA contends that release of the point value descriptions of the rating factors and the factor weights would compromise the utility of the ratings plan. Essentially, the EPA argues that if the information was released, applicants for the position would tailor their applications to emphasize their experience in those areas with the highest factor weights and also fabricate their previous experiences so as to fit within the highest point value level descriptions. The EPA contends, by way of an affidavit from one of its personnel specialists, that it is impossible for the EPA to verify each and every statement an

applicant makes. Thus, the EPA contends if it is forced to release this or any other rating plan, that the rating plans would be "obsolete for the purpose for which they were designed." *NTEU*, 802 F.2d at 530.

In *NTEU* the crediting plan at issue there was described by the court as "a road map that enables the interviewing officials to pose questions to an applicant, to explore his background and experience, and to evaluate his qualifications for the job sought," *id.* at 526, release of which would be tantamount to giving each applicant a list of exam questions. The rating plan in this case does not contain exam questions that are to be asked each applicant to test whether the applicant really has the experience he claims to have on his application. Here, if we order the release of the information sought, the EPA rating plan will not become obsolete. At most, the EPA will be forced to utilize a verification process to screen out fraudulent applications. This is because the EPA cannot change the required levels of experience needed for each job because the requirements, unlike questions about an applicant's experience, are not flexible. In the *NTEU* case, Customs would have had to revise the crediting plans to include new questions for each position. That cannot be done in this case. If the information on the EPA rating plan is released, the EPA cannot rewrite new qualifications for each applicant because the nature of the information sought is not the same as "test questions." The information sought refers to the experience necessary for the position and the relative value of that experience. That information remains the same for each person whether the potential applicant knows it ahead of time or not. Therefore, the EPA's plan does not fit within the parameters of this newly-created exemption to the FOIA as found in *NTEU*.[6]

The EPA's problem in this case is that it wants us to shield it from its own poor planning. If the information is unverifiable, then it should not be used to rate applicants. This only encourages and rewards deception. The crediting plans used in the *NTEU* case would appear to be a much more practical avenue to achieve the same goal. By having the applicants answer questions about their experience, the EPA could identify who really did what, and who was making it up. But this case is not about the relative virtues of one personnel plan over another; it is about the scope of the Freedom of Information Act. The overriding goal of the FOIA is to release information to the public. In very limited and narrow circumstances, the information may be withheld. As we have discussed above, the EPA has failed to demonstrate that the particular information sought to be released comes within any of the FOIA exemptions.[7] It would not serve the goals and objectives of the FOIA to allow the EPA to withhold information of significant public interest merely because it would make the EPA's personnel job more difficult.

Because we find that the EPA has not met its burden to establish the information requested under the Freedom of Information Act is covered by an exemption, we grant Kaganove's motion for summary judgment and deny the EPA's motion for summary judgment. The EPA is directed to release the requested information to plaintiff. It is so ordered.

---

6. Because we find that the EPA's rating plan does not fit within the judicially crated exemption in *NTEU v. Customs*, 802 F.2d 525 (D.C.Cir. 1986), we need not approve or disapprove of that opinion.

7. Because of our finding that the issue of promoting those with agency-wide experience is a matter of significant public interest, our holding applies only to the EPA.