**Arlene S. KAGANOVE,**
**Plaintiff–Appellee,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, et al.,**
**Defendants–Appellants.**

No. 87–2286.

United States Court of Appeals,
Seventh Circuit.

Argued March 28, 1988.

Decided Sept. 1, 1988.

Marc Richman, U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

Michael P. Seng, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, CUDAHY, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The Environmental Protection Agency (EPA) appeals from a judgment of the district court that ordered the EPA, pursuant to the Freedom of Information Act (FOIA), to release a document entitled "Merit Promotion Rating Plan Specifications" (Rating Plan), 664 F.Supp. 352 (N.D.Ill.1987). Arlene Kaganove, the appellee, was an unsuccessful candidate for a promotion to a position as a "Supervisory Environmental Protection Specialist" with the EPA. The Rating Plan is a two-page document created by

the EPA for its use when interviewing candidates for the position sought by Ms. Kaganove. After being denied the promotion, Ms. Kaganove sought disclosure of the Rating Plan. For the reasons that follow, we reverse the judgment of the district court.

I

Background

A. *Facts*

The Rating Plan is a document used by EPA evaluators to rank job candidates according to their experience and skills. The first part of the Rating Plan consists of the rating factors. The rating factors are evaluation categories that identify the experience and skills necessary for job performance. Each rating factor is assigned a numerical weight that reflects the importance of that factor to satisfactory job performance. The second part of the Rating Plan is a measuring device to evaluate the applicant's skills within each rating factor. This measuring device consists of four descriptions of experience levels for each rating factor. These descriptions attempt to categorize and distinguish each candidate's skills. Under the Rating Plan, each level of experience is assigned a point value from one to four, which is then multiplied by the rating factor. Applicants with the highest scores then are afforded further consideration.

After being denied the promotion to a Supervisory Environmental Protection Specialist, a GS–13 position, Ms. Kaganove sought release of the Rating Plan. The EPA refused Ms. Kaganove's request. It relied on Exemption 2 of the FOIA. 5 U.S.C. § 552(b)(2). That exemption allows an agency to refuse disclosure of documents that "relate[ ] solely to the internal personnel rules and practices of an agency." *Id.* The EPA claims that disclosure would provide applicants with detailed knowledge of rating formulas and, consequently, they might exaggerate their credentials. Because much of the information provided by job candidates is unverifiable,

or only verifiable at a great cost, the EPA submits that a device such as the Rating Plan is the only practicable means of ensuring the accuracy of the claims of employment applicants.

B. *District Court Opinion*

The EPA and Ms. Kaganove filed cross-motions for summary judgment. In ruling on those motions, the district court first concluded, relying on *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), that the EPA did not have to disclose the Rating Plan if the Plan did not relate to a matter of "genuine and significant public interest." *Id.* at 369, 96 S.Ct. at 1603. Applying *Rose* to the facts of this case, the district court concluded that there was a genuine and significant public interest in disclosure of the Rating Plan. *Kaganove v. United States Envtl. Protection Agency*, 664 F.Supp. 352, 358 (N.D.Ill.1987). The court noted that the EPA is a highly decentralized agency, and that a few years ago the EPA recognized the need to develop EPA personnel with agency-wide experience. The administrator of the EPA noted that the EPA needed to hire and promote qualified employees who had agency-wide experience. To achieve this goal, the administrator introduced a new EPA policy that emphasized a preference to promote people with diverse experiences who could bring an agency-wide perspective to EPA decisionmaking.

The court then examined a sample rating plan for a different EPA position that Ms. Kaganove had offered to the court. According to the court, this sample plan reflected a bias in favor of employees who had experience in a particular department area. This was in direct conflict with the EPA's objective of achieving agency-wide experience. Accordingly, the court concluded that "because of the complexity of the EPA's mission, the recognition by its own director of the need for EPA managers with agency-wide experience and the findings of the NAPA panel,[1] it is a matter

---

1. A panel of the National Academy of Public

Administration (NAPA) had suggested in a re-

of significant public interest whether the EPA is actively promoting those with agency-wide experience." *Id.* at 358 (footnote supplied). Thus, the court determined that there was a significant and genuine public interest in the document sought by Ms. Kaganove.

Having concluded that the Rating Plan did involve a matter of genuine public interest, the court proceeded to determine whether the document could nonetheless be protected under the approach announced in *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051 (D.C.Cir.1981) (en banc), and *National Treasury Employees Union v. United States Customs Service,* 802 F.2d 525 (D.C.Cir.1986) ("*NTEU*"). In *Crooker,* the District of Columbia Circuit developed a two-pronged test to be applied in Exemption 2 cases. That test asks (1) whether the document meets a test of predominant internality, and (2) whether disclosure would significantly risk circumvention of agency regulations or statutes. 670 F.2d at 1074. The *NTEU* court, relying on *Crooker,* held that an agency is not required to disclose documents when "disclosure ... would quickly render those documents obsolete for the purpose for which they were designed." 802 F.2d at 530. *NTEU* involved a document virtually identical to the one at issue here. An employee group sought, and was denied, disclosure of a rating system used by the Customs Service. The *NTEU* court said that disclosure of the rating system would allow potential job applicants to lie about their qualifications in order to obtain the position. Accordingly, the court held that the Customs Service did not need to disclose the rating system.

Here, the district court expressly declined to state whether it agreed with the *NTEU* decision. 664 F.Supp. at 361 n. 6. Rather, it distinguished *NTEU* by noting that, in that case, the document at issue was "a road map that enables the interviewing officials to pose questions to an applicant, to explore his background and experience, and to evaluate his qualifica-tions for the job sought." *Id.* at 361 (quoting *NTEU,* 802 F.2d at 526). Release "would be tantamount to giving each applicant a list of exam questions." *Id.* The Customs Service therefore would have to revise the questions for each interview. By contrast, opined the district court, the EPA here faced no such burden:

> [T]he EPA rating plan will not become obsolete. At most, the EPA will be forced to utilize a verification process to screen out fraudulent applications. This is because the EPA cannot change the required levels of experience needed for each job because the requirements, unlike questions about an applicant's experience, are not flexible.

*Id.* Thus, the court believed that *NTEU* was inapposite and that Exemption 2 of the FOIA did not provide the EPA with a basis for nondisclosure.

## II

### Analysis

The opinion of the district court reflects a careful study of the relevant statutory provisions. However, while we owe its labors our respectful and careful attention, we are presented here with a question of law that we review *de novo.*

The FOIA establishes a general legislative policy in favor of the disclosure of public documents. The Act contains, however, nine express exemptions that allow nondisclosure. *United States Dep't of Justice v. Julian,* —— U.S. ——, 108 S.Ct. 1606, 1611, 100 L.Ed.2d 1 (1988). "Congress created these exemptions because it 'realized that legitimate governmental and private interests could be harmed by release of certain types of information.'" *Id.* (quoting *FBI v. Abramson,* 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982)). Despite the exemptions, however, "disclosure, not secrecy, is the dominant objective of the Act." *Department of the Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 1 (1976). Be-

---

port to the EPA in 1984 that the EPA needed to broaden its hiring practices in order to obtain

managers with agency-wide experience.

cause of that objective, courts must construe the FOIA's nine exemptions " 'as narrowly as consistent with efficient Government operation.' " *Thurner Heat Treating Corp. v. NLRB,* 839 F.2d 1256, 1257 (7th Cir.1988) (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)). In interpreting these exemptions, it is helpful to keep in mind that the legislative and litigation history of the FOIA reveals a deep-seated tension between federal agencies, instinctively protective of the information in their files, and the congressional judgment that access to information ought to be the norm. In this context, the judiciary's responsibility is clear: it must give effect to congressional will.

Exemption 2 of the FOIA permits nondisclosure for documents that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). Under Exemption 2, both par-

ties to this appeal agree that the EPA need not release the Rating Plan if the Plan does not relate to a matter of "genuine and significant public interest." *Rose,* 425 U.S. 352, 369, 96 S.Ct. 1592, 1603, 48 L.Ed.2d 11 (1976).[2] Whether the Rating Plan relates to such a matter is, in our view, a close question. Ms. Kaganove argues that the EPA has a particularly important role within the federal government and that the EPA's personnel decisions are critical to its success. The record contains evidence that the administrator of the EPA has publicly said that the EPA needs managers with agency-wide experience. The same concern was expressed in a report submitted to the EPA in 1984 by a panel of the National Academy of Public Administration. Thus, the Rating Plan arguably relates to a matter of significant public interest because the Plan might help reveal whether the EPA's specific employment

---

2. In *Rose,* editors of the New York University Law Review sought disclosure of case summaries of honor code violations at the Air Force Academy. The editors sought to write an article on military discipline. The Court began its analysis by considering the general purposes of the FOIA. The Court said that the general philosophy of the FOIA was to require full agency disclosure unless information was exempted under clearly delineated statutory language. The FOIA's nine exemptions should "not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act. These exemptions are explicitly made exclusive, . . .' and must be narrowly construed." 425 U.S. at 361, 96 S.Ct. at 1599 (quoting *EPA v. Mink,* 410 U.S. 73, 79, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973)).

The Court then proceeded to examine the precise scope of Exemption 2, the exemption for information related "solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The Court noted that the House and Senate Reports on the FOIA differed with respect to the scope of Exemption 2. The Senate Report said that examples of documents which can be exempted under Exemption 2 were "personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like." S.Rep. No. 813, 89th Cong., 1st Sess. 8 (1965). The House Report, on the other hand, appeared to adopt an entirely different approach. That report said:

Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all 'matters of internal management' such as employee relations and working conditions and rou-

tine administrative procedures which are withheld under the present law.
H.R.Rep. No. 1497, 89th Cong., 2d Sess. 5 (1966) U.S.Code Cong. & Admin.News 1966, p. 2418.

The Court concluded that virtually all courts that have considered the issue have concluded that the Senate Report more accurately reflects congressional intent. Those courts that have relied on the House Report have only done so "where necessary to prevent the circumvention of agency regulations that might result from disclosure to the subjects of regulation of the procedural manuals and guidelines used by the agency in discharging its regulatory function." 425 U.S. at 364, 96 S.Ct. at 1600. According to the Court, the legislative history indicates that this was the primary concern of the committee drafting the House Report. The Court then concluded that it need not consider whether Exemption 2 allowed nondisclosure of information that "might help outsiders to circumvent regulations or standards" because there was no such threat in the case. *Id.* (quoting *Rose v. Department of the Air Force,* 495 F.2d 261, 265 (2d Cir.1974)). Accordingly, the Court relied on the Senate Report, and said that "Exemption 2 is not applicable to matters subject to . . . a genuine and significant public interest." *Id.* at 269.

The Court proceeded to analyze whether case summaries of honor code violations and how they were treated were matters of genuine and significant public interest. The Court noted the unique nature of the armed forces and said that discipline and honor are critical to their effective operation. Therefore, the Court concluded that the public had a genuine and significant interest in how the Air Force Academy was dealing with violations of the Honor Code.

criteria, at least for the position sought by Ms. Kaganove, unduly focus on job and educational experience within a narrow subspecialty. On the other hand, the problems of recruitment, retention, and advancement experienced by the EPA are no doubt shared by many other agencies of government who, like the EPA, should shoulder tremendous responsibility for the safety and welfare of the nation. Yet, it is not entirely free from doubt that all hiring devices for all agencies at all grades can be considered matters of "a genuine and significant public interest." *Rose*, 425 U.S. at 369, 96 S.Ct. at 1603.

We need not decide this close question. In *Rose*, the Supreme Court concluded that the primary purpose of Exemption 2 was to exempt from disclosure documents devoid of genuine and significant public interest. 425 U.S. at 364–69, 96 S.Ct. at 1600–03 (relying on S.Rep. No. 813, 89th Cong., 1st Sess. 8 (1965)). However, the Court did not foreclose the possibility that Exemption 2 might be applicable in other situations as well. Indeed, the Court specifically noted that it "need not consider in this case the applicability of Exemption 2 in such circumstances ... 'where knowledge of administrative procedures might help outsiders *to circumvent regulations or standards.*'" *Id.* at 364, 96 S.Ct. at 1601 (emphasis supplied) (quoting *Rose v. Department of the Air Force*, 495 F.2d 261, 265 (2d Cir.1974)). In *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C.Cir.1981) (en banc), the District of Columbia Circuit addressed this issue left open in *Rose*. It concluded that Exemption 2 was applicable when a document "meets the test of 'predominant internality,' and if disclosure significantly risks circumvention of agency regulations or statutes...." *Id.* at 1074.[3] In *Crooker*, the District of Columbia Circuit relied heavily on the concurring opinion of Judge Leventhal in *Jordan v. United States Dep't of Justice*, 591 F.2d 753 (D.C. Cir.1978) (en banc):

> Exemption 2 is applicable where the document consists of internal instructions to such government officials as investigators and bank examiners. In such a case disclosure would permit circumvention of the law, and there is no substantial, valid external interest of the community at large in revelation. That composite presents a matter that involves solely internal personnel rules and internal practices of an agency for purposes of making Exemption 2 applicable.

*Jordan*, 591 F.2d at 783 (Leventhal, J., concurring). Moreover, noted the court in *Crooker*, the legislative history of the FOIA, when evaluated in the "context of the whole Act," 670 F.2d at 1062 (quoting *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962)), also evidences Congress' concern "to permit the effective operation of the government." *Id.* at 1065. For instance, noted the court, while requiring that staff manuals be made available to the public for copying in section 552(a)(2)(C), Congress clearly evidenced a "deep concern that manuals setting forth guidelines for auditing and inspection procedures should not be released to the public." *Id.* at 1063. While acknowledging that *Rose* found the Senate rather than the House Report a more accurate reflection of the congressional intent on the scope of Exemption 2,[4] *Rose*, 425 U.S. at 363–64, 96 S.Ct. at 1600–01, the *Crooker* court also noted that there was no disagreement between the reports on the exemption of government investigatory or examination manuals. 670 F.2d at 1061.

The Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, subtit. N, 100 Stat. 3207, 3207–48 (1986), evidences that *Crooker* was correctly decided. The Reform Act codified *Crooker*, as it applies to law enforcement agencies, into Exemption

---

**3.** A similar result had been reached in *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653 (9th Cir.1980), and in *Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544 (2d Cir.1978). *But see Hawkes v. IRS*, 467 F.2d 787 (6th Cir.1972) (holding that documents that would invite circumvention of agency regula-

tions are not exempt under exemption (b)(2), but are exempt from disclosure under 5 U.S.C. § 552(a)(2)(C)); *Cox v. United States Dep't of Justice*, 576 F.2d 1302 (8th Cir.1978) (same).

**4.** *See supra* note 2 for discussion of the House and Senate Reports.

7 of the FOIA. Pursuant to section 1802 of the Reform Act, Exemption 7 now provides, in pertinent part, that "guidelines for law enforcement investigations or prosecutions [need not be disclosed] if such disclosure could reasonably be expected to *risk circumvention of the law....*" 5 U.S.C. § 552(b)(7)(E) (emphasis supplied). The legislative history of the Reform Act expressly states that this amendment was modeled after "the 'circumvention of the law' standard that the D.C.Circuit established in its en banc decision in *Crooker v. BATF,* 670 F.2d 1051 (D.C.Cir.1981) (en banc) (interpreting Exemption 2)." S.Rep. No. 221, 98th Cong., 1st Sess. 25 (1983), *reprinted in relevant part in* 132 Cong. Rec. H9466 (daily ed. Oct. 8, 1986). Because Congress saw fit to codify the very language of *Crooker,* and because nothing in the legislative history of the Reform Act suggests the slightest disagreement with that case's holding, we believe that *Crooker* accurately expresses congressional intentions.

As noted above, in *NTEU,* the District of Columbia Circuit applied *Crooker* to a case very much like ours. The *NTEU* court held that Exemption 2 was applicable even if the agency could not identify a particular statute or regulation threatened by disclosure. Rather, the court said that *Crooker* was apposite whenever a document related to predominantly internal personnel matters and if disclosure of the document would render it "obsolete for the purpose for which [it was] designed." 802 F.2d at 530. Of course, the purpose of the document must be legitimate and the document must not constitute "secret law." *Id.* at 531.

*NTEU*'s construction of Exemption 2 is, in our view, consistent with the purposes of the FOIA. In *Rose,* the question left open by the Court was whether Exemption 2 applied when "regulations or *standards*" might be circumvented. 425 U.S. at 364, 96 S.Ct. at 1601 (emphasis supplied). The word "standards" suggests that the Court envisioned that internal personnel documents might be exempt under Exemption 2 even if disclosure would not necessarily risk circumvention of "law." The objective of the FOIA is to maximize dissemination of agency information without impeding " 'efficient Government operation.' " *Thurner Heat Treating Corp. v. NLRB,* 839 F.2d 1256, 1257 (7th Cir.1988) (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)). The objectives of government agencies—which are of course embodied in public law—would be completely defeated by requiring disclosure of documents relating to the employment process that are effective only when kept confidential.

In our view, there is little doubt that the Rating Plan is a legitimate internal personnel document and that disclosure of the Rating Plan would frustrate the document's objective. The Rating Plan is the sort of document that the EPA, and any other employer, reasonably would expect to be internal. Release of the Rating Plan would render it ineffectual because some job candidates, once informed in detail of the experiences that the EPA considered most valuable for a particular job, might amend the description of their prior employment. As the *NTEU* court said, referring to documents highly similar to the EPA's Rating Plan:

The crediting plans are designed to measure actual experience and proven ability; it would seem to follow, in theory, that advance knowledge of their content should not affect the rating of the candidates. But the theoretical assumption is valid only if all applicants can be depended upon to be meticulously correct in describing their past experience and their qualified or quantifiable abilities. The uncontradicted affidavits of agency officials lead to the conclusion, however, that advance knowledge of the plans by applicants would allow and induce at least some of them to embellish—or perhaps even fabricate—their backgrounds to suit the appropriate crediting plan. Moreover, the indications are that the [United States Customs Service] does not possess the human and financial resources needed to identify fabrications, to verify their falsity, and to pursue the offending applicants with appropriate legal action. Indeed, it appears that a

great many of the elements in a crediting plan are capable of embellishment by an applicant in a manner that is not strictly fraudulent, or that cannot be proven to be fraudulent.

*NTEU*, 802 F.2d at 529 (footnotes omitted).

We can see no significant difference between *NTEU* and our case. The EPA's Rating Plan is designed to measure an applicant's "actual experience and proven ability." *Id.* Uncontradicted affidavits offered by EPA officials suggest that advance knowledge of the Rating Plan would allow candidates to embellish their job and educational history in unverifiable ways so that they would receive a higher score on the Rating Plan's numerical system. The district court suggested that the EPA could verify the information provided by job candidates. This objection ignores the EPA's submission that the practicalities of government administration and finance make such verification extraordinarily difficult if not impossible.

Accordingly, the judgment of the district court is reversed.

REVERSED.