**NATIONAL TREASURY EMPLOYEES UNION, Appellant,**

v.

**U.S. CUSTOMS SERVICE, et al.**

No. 84–5754.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1985.

Decided Sept. 26, 1986.

Gregory J. O'Duden, with whom Lois G. Williams and Michael J. McAuley, Washington, D.C., were on brief, for appellant.

Allan L. Martin, Counsel, U.S. Customs Service, with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Charles F. Flynn, Asst. U.S. Attys. and Linda A. Ruiz, Sp. Asst. U.S. Atty. Washington, D.C., were on brief, for appellees.

Before MIKVA and STARR, Circuit Judges, and GREENE,* District Judge.

Opinion for the Court filed by District Judge HAROLD H. GREENE.

This Freedom of Information Act (FOIA)[1] suit challenges the denial by the United States Customs Service (USCS or Service) of a request by the National Treasury Employees Union (NTEU) for copies of certain documents—known as "crediting plans"—that are used by the Service to evaluate the qualifications of applicants for seven types of positions.[2] Each of these crediting plans outlines the experience level and the demonstrated abilities required for a particular position, and it lists a variety of items in the applicants' backgrounds that the Service considers to be appropriate indicia of the requisite experience or ability.[3] The plans, which are not shown to the applicant, in effect constitute a road map that enables the interviewing officials to pose questions to an applicant, to explore his background and experience, and to evaluate his qualifications for the job sought.

By letters dated April 20, 1982, NTEU, which represents USCS employees, filed

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 5 U.S.C. § 552.

2. The seven positions are Senior Inspector (GS–1899–11), Import Specialist Team Leader (GS–1889–12), Customs Patrol Officer (GS–1884–9), Entry Level Customs Inspector (GS–1899–5), Entry Level Import Specialist (GS–1889–5), Entry Level Customs Patrol Officer (GS–1884–5), and Customs Warehouse Officer (GS–1845–4/5/6).

3. For example, a crediting plan for the position of Customs Inspector, obtained by appellant in 1979 from the Miami, Florida office of USCS, asks evaluators to rate the applicant's "ability to interpret and apply laws and regulations" as either excellent, good, moderate, limited or poor. The plan gives "typical examples" of factors in an applicant's background that would support each rating, such as a baccalaureate degree (indicative of excellent ability) or experience in a "position[ ] which required [the] applicant to obtain and apply technical information" (indicative of good ability). Joint Appendix (J.A.) at 75.

FOIA requests with the regional commissioners of all nine regions of the Service seeking access to the crediting plans used to evaluate the seven positions in question. After pursuing its administrative remedies,[4] NTEU received the Service's final decisions on November 10, 1982, announcing that nineteen plans would be withheld and forty-four released with substantial redactions. The agency's decision[5] was claimed to be based on section 552(b)(2) of the FOIA, under which information "related solely to the internal personnel rules and practices of an agency" is exempt from disclosure.[6] NTEU brought an action to challenge these denials,[7] but the District Court dismissed the suit upon USCS's motion for summary judgment, 602 F.Supp. 469 (1984).[8] That decision is now before us for review.

## I

■ Appellants first contend that the affidavits submitted to the District Court were conclusory and did not "describe the documents and the justifications for nondisclosure with reasonably specific detail," *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981), and therefore cannot support a grant of summary judgment under the rule of *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). The index required by *Vaughn* is designed to permit adequate adversary testing of the agency's claimed right to an exemption. *Mead Data Central v. United States Department of Air Force*, 566 F.2d 242, 251 (D.C.Cir.1977); *Vaughn*, 484 F.2d

at 828. A claim of exemption will be honored when the agency meets its burden of showing that the withheld records are actually of such a character as to fit one or more of the section 552(b) exemptions. *Shaw v. FBI*, 749 F.2d 58, 61 (D.C.Cir. 1984).[9]

■ Upon its review of the agency affidavits, the District Court concluded that they were adequate to satisfy the requirements of *Vaughn*. We see no reason for disagreeing with that conclusion. The issues in this case were relatively simple and straightforward. All of the documents were withheld under a single exemption. *Compare Vaughn*, 484 F.2d at 827–28. The documents, while numerous, were all of the same general type and all had the same purpose. The agency's theory regarding each crediting plan was the same: that disclosure would compromise the fairness and reliability of the promotion process and thus have the effect of circumventing agency efforts designed to protect that process.

More specifically, the deleted material was described as either (1) "qualifying language used in each criteria to evaluate the experience claimed by each candidate" or (2) specific "examples of experience under each criteria" which the agency considered relevant to its rating.[10] These descriptions, when read together with those portions of the crediting plans that were disclosed, provide facts sufficient to sustain a meaningful adversarial process, and they appropriately enabled the District Court to go on to consider whether the described documents qualify as exempt under section 552(b)(2).

---

4. *See* 5 U.S.C. § 552(a)(6).

5. Prior to making its decision, Customs sought and received guidance from the Office of Personnel Management.

6. Although USCS also relied on exemption (b)(5) (intra-agency memoranda), appellee's motion for summary judgment and the District Court decision granting that motion relied entirely on exemption (b)(2) to justify the agency's denial of access.

7. *See* 5 U.S.C. § 552(a)(4)(B).

8. NTEU's cross-motion for summary judgment was denied.

9. An adversary cannot challenge, and a court cannot review, the agency's claim of exemption without (1) an adequate description of the records; (2) a plain statement of the exemptions relied upon to withhold each record; and (3) arguments that relate the documents to the claimed exemption. A *Vaughn* index directly addresses the first two elements and enables a court to consider the parties' contentions.

10. Affidavit of B. James Fritz. J.A. at 47.

*See, e.g., Military Audit Project,* 656 F.2d at 738; *Baez v. United States Department of Justice,* 647 F.2d 1328, 1335 (D.C.Cir. 1980).

## II

■ Exemption (b)(2) covers materials "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The court below analyzed the case under the two-prong test applied to claims for (b)(2) exemptions in *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051, 1074 (D.C.Cir. 1981) (*en banc*). That test asks (1) whether the document meets a test of predominant internality and (2) whether disclosure would significantly risk circumvention of agency regulations or statutes. We agree with the District Court's reliance on *Crooker* even though this case does not snugly fit that decision's reference to agency regulations and statutes. *See* Part IV, *infra.*

The *Crooker* test was a response to the difficulties that had arisen in applying the language of exemption (b)(2) to particular cases. In *Crooker* itself, for example, the appellant had sought the release of portions of an agent's training manual from the Bureau of Alcohol, Tobacco and Firearms (BATF). The requested material consisted of instructions to the BATF agents on the conduct of their official duties, and in that respect it was obviously related to "personnel rules and practices of an agency." The more difficult question, however, was whether the material related *solely* to internal personnel rules and practices, and in that respect it was illustrative of many exemption (b)(2) issues.

On the one hand, as we acknowledged in *Crooker,* every action of the federal government has in one sense "some effect on the public-at-large," *Crooker,* 670 F.2d at 1073, for " 'there are few events in our society today that occur without so much as a tiny ripple effect outside their area of prime impact.' " *Id.* at 1073 (*quoting*

*Vaughn v. Rosen,* 523 F.2d 1136, 1150 (D.C.Cir.1975) (Leventhal, J., concurring)). Thus, government records that relate to the management of agency employees will almost never qualify as records "related solely to the internal personnel rules and practices of an agency" if the statutory language is narrowly construed. On the other hand, however, this Court was able in *Crooker* to conclude from the legislative history of the FOIA that Congress intended the exemption to be broad enough to cover personnel rules and practices that are "not 'the subject of legitimate public interest.' " *Id.* at 1065.[11] On this basis, we held that an agency may withhold material under exemption (b)(2) if it is able to demonstrate that (1) the material is "predominantly internal[]" and (2) "disclosure [would] significantly risk[] circumvention of agency regulations or statutes." *Id.* at 1074.

## III

■ The parties to the instant appeal agree that the *Crooker* test governs this case, but they disagree as to the appropriate result when *Crooker* is applied to these facts. Before addressing the legal questions raised by the parties, it is useful to analyze the practical reasons underlying USCS's reluctance to disclose the plans, as well as NTEU's policy arguments in favor of disclosure. *See Ginsburg, Feldman and Bress v. Federal Energy Administration,* 591 F.2d 717, 730 (D.C.Cir.), *aff'd on reh'g by an equally divided en banc court,* 591 F.2d 752 (1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979).

The Service regards crediting plans as being tantamount to lists of examination questions, and it argues that disclosure of the plans would undercut the personnel evaluation process they are designed to assist, providing those who have access to the crediting plans (through NTEU or otherwise) with an unfair advantage over oth-

---

11. *See Department of the Air Force v. Rose,* 425 U.S. 352, 369–70, 96 S.Ct. 1592, 1603, 48 L.Ed.2d 11 (1976) (statute exempts material "in which the public could not reasonably be expected to have an interest").

er applicants. NTEU argues, on the other hand, that the plans are simply akin to lists of job requirements pertinent to particular positions. In its view, because the plans are designed only to elicit information about an applicant's actual experience and demonstrated abilities,[12] advance knowledge of a particular plan will not provide him with any special advantage. On the contrary, familiarity with the plans by the general pool of applicants will enhance the evaluation process by encouraging each applicant to point out to the examiners those elements of his background that are relevant to the position he seeks.

The crediting plans are designed to measure actual experience and proven ability; it would seem to follow, in theory, that advance knowledge of their content should not affect the rating of the candidates. But the theoretical assumption is valid only if all applicants can be depended upon to be meticulously correct in describing their past experience and their quantified or quantifiable abilities. The uncontradicted affidavits of agency officials lead to the conclusion, however, that advance knowledge of the plans by applicants would allow and induce at least some of them to embellish—or perhaps even fabricate—their backgrounds to suit the appropriate crediting plan.[13] Moreover, the indications are that the USCS does not possess the human and financial resources needed to identify fabrications, to verify their falsity, and to pursue the offending applicants with appropriate legal action.[14] Indeed, it appears that a great many of the elements in a crediting plan are capable of embellishment by an applicant in a manner that is not strictly fraudulent, or that cannot be proven to be fraudulent.[15]

On this basis, we agree with the USCS contention[16] that release of the plans creates a significant risk that the Service's applicant evaluation program will be seriously compromised, in violation of a cornerstone of the congressionally mandated merit system principle: that selection and advancement in the federal civil service should be based solely on the basis of relative ability, knowledge, and skills, after fair and open competition "which assures that all receive equal opportunity." 5 U.S.C. § 2301(b)(1).

## IV

NTEU argues that this risk, even if it does exist, does not sustain application of the section (b)(2) exemption under *Crooker* unless the Service is also able to demonstrate that "disclosure significantly risks

12. A crediting plan consists of two basic parts: (1) a set of evaluative criteria which reflect the specific knowledge, skills, abilities, and other characteristics deemed necessary for the successful performance of a particular job; and (2) measurement devices used to determine to what extent a candidate possesses the requisite criteria deemed necessary for successful performance. Only the second part is in dispute here.

13. Thus, B. James Fritz, a Customs personnel official, submitted an affidavit in which he stated that

In the crediting plans released ..., examples of experience were withheld which consist of responsibilities and assignments concerning, for example, the complexity of duties, the degree of supervision, the levels and types of personal interactions, which, if released, could be claimed by any candiate with impunity because the candidates' responses would not be verifiable.

J.A. at 48.

Similarly, William R. Irvin, an official of the Office of Personnel Management, stated in his affidavit that if the information were released, individuals could tailor their applications to inflate scores. J.A. at 38–42.

14. The Irvin affidavit points out that the problem of fabricating would be acute because of the difficulty in verifying much of the information. To be sure, outright fabrication could be a federal offense, 18 U.S.C. § 1001, but the fairly remote possibility of a prosecution and conviction is claimed not to constitute an adequate deterrent.

15. For example, an applicant's claim that he has "frequently" advised top management with respect to policy in his previous position could constitute an exaggeration without being actionable, as a practical matter, under section 1001 or any other statute or regulation.

16. OPM likewise concluded that release of the information "would give an unfair advantage to certain candidates and compromise the utility of the plan[s] as a testing device." Irvin affidavit. J.A. at 41.

circumvention of agency regulations or statutes." The Service contends that such a regulation exists in subchapter S6–1 of the Federal Personnel Manual Supp. 335–1 (Aug. 20, 1982), which instructs supervisory personnel in the federal service to identify

> examination materials (such as ... crediting plans) ... which, if exposed to unauthorized persons, might provide unfair advantage to some candidates or otherwise compromise the ... selection procedure.... [17]

The Manual further specifies that such materials "shall be controlled and safeguarded because their release would be detrimental to the validity and fairness of the evaluation process...." From the foregoing discussion of the risks created by release of the crediting plans, it is apparent that disclosure in this case would run counter to the directive of subchapter S6–1.

■ Nevertheless, we do not regard these regulatory provisions as dispositive of the issue before us for the reason that an agency cannot be regarded as having satisfied the second prong of the *Crooker* test simply by promulgating a regulation [18] designating certain material as confidential. If such a regulation were sufficient, the result would be a de facto abdication by the courts of their responsibility to review *de novo* agency actions withholding documents. *See* 5 U.S.C. § 552(a)(4)(B); *Weisberg v. Department of Justice*, 489 F.2d 1195, 1202 (D.C.Cir.1973) (*en banc*), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). What a court obviously must do in this context is to determine whether the release of purportedly confidential material risks circumvention of some statute or regulation other than the one designating the material as confidential.

Normally, an agency will be unable to satisfy the *Crooker* test unless it identifies such a statute or regulation and persuades the reviewing court that disclosure of the disputed documents will facilitate conduct that the statute or regulation proscribes. That was the case in *Crooker* itself, where disclosure of manuals used by law enforcement personnel would have made it easier for criminals to violate statutes regulating the use of tobacco, alcohol and firearms. *Accord Founding Church of Scientology of Washington, D.C. v. Smith*, 721 F.2d 828 (D.C.Cir.1983); *Hardy v. Bureau of Alcohol, Tobacco and Firearms*, 631 F.2d 653 (9th Cir.1980); *Caplan v. Bureau of Alcohol, Tobacco and Firearms*, 587 F.2d 544 (2d Cir.1978).

Although the Service cannot here rely on a specific statute or regulation (other than subchapter S6–1 discussed above), the instant case is nevertheless factually very similar to *Crooker* and controlled by that decision. There, it was found that disclosure of the investigative strategy used by BATF agents to detect criminal violators would make that detection more difficult. Here, it is apparent that disclosure of the evaluative criteria used by USCS personnel will make it more difficult correctly to evaluate job candidates. Like *Crooker*, this is a case where disclosure of certain government documents would quickly render those documents obsolete for the purpose for which they were designed.[19] The Freedom of Information Act's nine exemptions balance a strong public policy in favor of disclosure against "the legitimate but limited need for secrecy to maintain the effective operation of Government." *Crooker*, 670 F.2d at 1062. Where disclosure of a particular set of documents would render those documents operationally useless, the *Crooker* analysis is satisfied whether or

---

17. J.A. at 56.

18. For reasons that will become clear, we find it unnecessary to decide whether Subchapter S6–1 is or is not a "regulation."

19. In a somewhat similar case, involving disclosure of a government agency's auditing procedures, this Court asked: "Why should an employee who seeks to embezzle money from a bank be given access to the examiner's special instructions for auditing his type of bank so that he can discover how to disguise his defalcations?" *Ginsberg, Feldman & Bress*, 591 F.2d at 730. Although we are not dealing here with criminal behavior, the guiding principle is much the same.

not the agency identifies a specific statute or regulation threatened by disclosure.

Obviously, the operations for which such documents are designed must themselves be legitimate activities of government, authorized by statute. Exemption (b)(2) emphatically does not authorize the promulgation of "secret law" governing members of the public, and such documents would be unprotected whether or not disclosure threatened to make them operationally obsolete. *See Department of the Air Force,* 425 U.S. at 369, 96 S.Ct. at 1603; *Crooker,* 670 F.2d at 1073. That is not the case here, however. The crediting plans do not regulate the conduct of members of the public; rather, they are concerned only with the core personnel functions of hiring and promotion. Evaluative criteria of this type have customarily been safeguarded in both the public and private sectors, and it seems plain that Congress meant to protect such material under exemption (b)(2).

Whatever else may be included within exemption (b)(2), we are of the view that Congress meant to include materials traditionally used by personnel officials to evaluate candidates for job promotion. First, these materials fall squarely within the statutory language: matters "related solely to the internal personnel rules and practices of an agency." Although, as we have noted, appointment decisions, like any government activity, have some impact upon the public, the appointments of individual members of the lower federal bureaucracy is primarily a question of "internal" significance for the agencies involved.[20] As a number of district courts have noted, the management of its own employees is a matter of intra-agency functioning and is the agency's responsibility.[21] The crediting plans at issue here are indisputably concerned with "personnel rules and practices" under even the narrowest reading of that phrase. Second, the legislative history of the FOIA, while not without some ambiguity, supports the view that "manuals setting forth guidelines for auditing or inspection procedures should not be released to the public." *Crooker,* 670 F.2d at 1063.[22] Third, it is entirely consistent with sound policy objectives and common sense to conclude that Congress did not intend to mandate the release of evaluative criteria that are commonly treated as confidential by personnel departments in both the public and private sectors.[23]

The District Court correctly decided that the crediting plans are exempt from disclosure under the Freedom of Information Act, and its decision is therefore

*Affirmed.*

---

**20.** It is not surprising, therefore, that this suit was brought by the representatives of those government employees, and that there is no indication of a generalized public interest in the contents of USCS crediting plans.

**21.** *See Malizia v. United States Department of Justice,* 519 F.Supp. 338, 345 (S.D.N.Y.1981) (applying section 552(b)(2) exemption to "information regarding general personnel management procedures"); *NTEU v. U.S. Department of Treasury,* 487 F.Supp. 1321, 1324 (D.D.C.1980) (applying exemption to agency's analysis of its collective bargaining duties); *Frank v. U.S. Department of Justice,* 480 F.Supp. 596, 597–98 (D.D.C. 1979) (applying exemption to information regarding management disputes between special agents of FBI and their superiors); *Bernknopf v. Califano,* 466 F.Supp. 319, 322 (W.D.Pa.1979) (applying section 552(b)(2) to exempt agency information concerning outside law practices of its administrative law judges).

**22.** The legislative history relevant to exemption (b)(2) is exhaustively treated in this Court's opinion in *Crooker,* and will not be repeated here. *See Crooker,* 670 F.2d at 1055–66. The Supreme Court also addressed that history in *Department of the Air Force,* 425 U.S. at 362–70, 96 S.Ct. at 1599–1603, but declined to decide whether circumvention of statutes or regulations is a necessary ingredient of the exemption.

**23.** That conclusion is buttressed by the merit principles codified in such statutes as 5 U.S.C. § 2301(b)(1), which provides that "selection and advancement [of federal employees] should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity."