**UNION OF CONCERNED SCIENTISTS**

v.

**U.S. NUCLEAR REGULATORY COMMISSION, et al., Appellants, General Electric Company.**

**No. 85–6227.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 29, 1987.

Decided July 31, 1987.

Nathan Dodell, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence, Asst. U.S. Attys., William H. Briggs, Jr., Sol., U.S. Nuclear Regulatory Commission, E. Leo Slaggie, Deputy Sol., Nuclear Regulatory Com'n, and Karla D. Smith, Atty., U.S. Nuclear Regulatory Com'n, Washington, D.C., were on brief for appellants.

Diane Curran, with whom Andrea C. Ferster and Ellyn R. Weiss, Washington, D.C., were on brief, for appellee.

Before WALD, Chief Judge, STARR, Circuit Judge, and McGOWAN, Senior Circuit Judge.

McGOWAN, Senior Circuit Judge:

The appellants, the Nuclear Regulatory Commission ("NRC" or "Commission") and the United States of America, challenge an attorney's fees award of $18,876.04 to the appellee, Union of Concerned Scientists ("UCS"). The District Court awarded these fees in a case brought under the Freedom of Information Act, 5 U.S.C. § 552 (1982 & Supp. III 1985) ("FOIA"), in which UCS sought a "probabilistic risk assessment" ("PRA") prepared by the General Electric Company ("GE") for its nuclear reactor design known as GESSAR–II.

We find that the District Court did not clearly err nor abuse its discretion in concluding that UCS was eligible for, and entitled to, attorney's fees under the FOIA. However, full findings of fact must be made to support a court's belief that a party has substantially prevailed in a lawsuit before a grant of attorney's fees can be awarded. Because we do not believe that the District Court's Memorandum Opinion of October 22, 1985 contained adequate findings, we remand the case to the District Court for further explanation or factual findings supporting its conclusion that UCS substantially prevailed in this lawsuit.

## I.

The General Electric Company applied to the NRC for final approval of its GESSAR–II standard design nuclear power plant. In support of its application, GE submitted a PRA as well as supplementary information, requesting that this material be kept confidential.[1] Br. of Appellants at 2. They produced an affidavit explaining why the material was proprietary in nature and the harm that would be incurred by GE if the material were disclosed. J.A. at 31–36. Brookhaven National Laboratory, under contract with the NRC, reviewed GE's application and generated various reports on the PRA. *See* Br. of Appellants at 2.

The Union of Concerned Scientists filed a FOIA request with the NRC on March 13, 1984, seeking production of the PRA and review documents prepared by NRC and its contractors.[2] J.A. at 18–19. The NRC did not respond within the statutory ten day time period, and UCS thus treated the failure to respond as a denial, filing an administrative appeal on April 5, 1984. J.A. at

---

1. At various stages in the licensing and regulatory process, the NRC relies on PRAs to identify major nuclear power plant design weaknesses that may contribute significantly to accident risk. Br. of Appellee, *citing* Proposed Commission Policy Statement on Severe Accidents and Related Views on Nuclear Reactor Regulation, 49 Fed.Reg. 16,014, 16,015, Col. 3, April 13, 1983. Joint Appendix ("J.A.") at 7.

2. The PRA, related correspondence, and reports totalled over 4,000 pages of text. Br. of Appellants at 2.

20–21. On May 24 and June 2, 1984, the NRC advised UCS that the PRA and related documents contained information GE deemed to be proprietary. J.A. at 26, 28, 30. On June 25, 1984, the NRC notified UCS that it had decided to withhold the entire text of the GESSAR–II PRA and three review documents, stating that it agreed with GE that the documents were exempt from disclosure under Section 552b(c)(4) of FOIA ("Exemption 4") (protecting from disclosure "trade secrets and commercial or financial information obtained from a person and privileged and confidential"). J.A. at 37–39.

UCS filed an administrative appeal of the denial on August 6, 1984, claiming that GE had not taken consistent positions with respect to the proprietary nature of the information withheld. J.A. at 44–49.[3] The NRC agreed, indicating that it was necessary for GE and the NRC to re-review all of the documents. J.A. at 50, 58, 144–45. Due to the volume of pages, the NRC stated that it would be unable to respond to the appeal within the statutory twenty day period, and that it would inform UCS of the NRC's final decision. *Id.*

UCS filed suit in District Court on September 12, 1984 seeking 40 documents and approximately 4,000 pages. J.A. at 69–76. On December 3, 1984, the NRC released over 2,000 partial pages. J.A. at 53, 55–57. By a court-approved stipulation on December 17, 1984, the parties agreed to limit the litigation to seven primary documents consisting of the PRA and supplementary documentation for GESSAR–II. This stipulation reduced the 4,000 pages originally at issue to approximately 1,600. J.A. at 84. The NRC submitted a *Vaughn* index on February 1, 1985. J.A. at 86–98. *See National Treasury Employees Union v. U.S. Customs Service*, 802 F.2d 525, 527 (D.C. Cir.1986) (generally describing a *Vaughn* index and citing authorities). The NRC released approximately 110 full and partial pages of the 1,600 total pages sought. J.A. at 64.

GE intervened in this action on February 8, 1985. On February 21, 1985, GE and the NRC filed motions for summary judgment. Appellants claimed that the withheld materials in the PRA contained information that, if disclosed, would cause substantial injury to GE's competitive position and that these materials therefore were exempt from disclosure under Exemption 4. 5 U.S.C. § 552b(c)(4). J.A. at 99–102. UCS filed a cross-motion for partial summary judgment urging, *inter alia*, that (1) the NRC and GE had failed to demonstrate competitive injury and, thus, were not entitled to summary judgment; (2) the NRC, in violation of 10 C.F.R. § 2.790(b)(5) (1985), had failed to make a discretionary release of exempt material despite the asserted overriding public interest; and (3) ten categories of quantitative results could be publicly released without competitive harm to GE, entitling UCS to partial summary judgment. *See* Br. of Appellants at 6.

The District Court, on June 6, 1985, granted GE and the NRC partial summary judgment on the NRC's exercise of its discretion in refusing to release voluntarily materials claimed to be exempt under Exemption 4. Slip op. at 6. The lower court denied the NRC summary judgment on the Exemption 4 claims, finding that although GE made a "substantial" showing of harm, UCS had controverted this showing, creating a factual dispute. *Id.* at 5. A trial was deemed necessary to determine the issue of substantial competitive harm to GE's position. *Id.*

On July 18, 1985, GE agreed to release six of the ten categories of documents on which UCS had sought summary judgment—a total of eleven pages—in return for UCS dropping its action.[4] J.A. at 131–

---

**3.** In particular, UCS noted that the PRA would be used to obtain a generic license valid over the next ten years, affecting the quality of any individual plant licensed to the GESSAR–II design. Br. of Appellee at 9–10. UCS also argued that the public was entitled to participate in decisions in which the PRA was used to change the GESSAR–II design. Finally, UCS noted that this was the first PRA that had been withheld from the public as confidential commercial information. *Id., citing* J.A. at 47, 48.

**4.** The NRC was not a party to the settlement negotiations. *See* Br. of Appellants at 7.

34, 151–61. GE released the eleven pages and the court dismissed the suit with prejudice. *See* Br. of Appellants at 7.[5]

The parties then litigated the issue of attorney's fees. At the center of the controversy giving rise to this appeal is the District Court's Memorandum Opinion and Order of October 22, 1985, which granted UCS the full amount of attorney's fees and costs that it sought, totalling $18,876.04. J.A. at 148–49.

## II.

#### A. Bifurcation of Phases of Litigation for Award of Attorney's Fees Under the FOIA

As a preliminary matter, appellants contend that the facts of this case require this Court to review the District Court's award of attorney's fees in a bifurcated fashion because the litigation allegedly occurred in two distinct phases, each with its own set of document releases. *See* Br. of Appellants at 8. Phase I encompasses actions that occurred after UCS filed its complaint and before the summary judgment proceedings were initiated. *See, e.g.,* Br. of Appellee at 21 n. 29; Br. of Appellants at 4, 30. During this phase, the NRC administrative review of the FOIA request continued.[6] *Id.* Phase II begins with the cross-motions for summary judgment and focuses on 1,500 technical pages that the parties had agreed to put at issue and which the NRC withheld. This phase concluded when GE released eleven pages as a result of its settlement with UCS. J.A. at 151–61.[7]

UCS urges this Court to reject the Commission's suggestion that the District Court was required to consider its fee petition in two distinct phases. Br. of Appellee at 22. First, it alleges that this decision as to bifurcation rests entirely within the District Court's discretion. *Id.* Second, UCS asserts that this case does not lend itself to the type of bifurcation suggested by *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the case cited by the NRC in support of its bifurcation argument. In light of the need for the District Court to explain fully or to make further findings as to other aspects of the attorney's fee award, we do not pass upon the issue of bifurcation.[8]

#### B. Award of Attorney's Fees Under the FOIA

■ By its terms, the FOIA allows a court to award reasonable attorney's fees to a party who has substantially prevailed in a lawsuit by obtaining the release of information requested but not provided by an agency.[9] *See* 5 U.S.C. § 552a(g)(2)(B) (1982). A two-pronged test for assessing the discretionary award of attorney's fees under the FOIA has emerged. First, the awarding court must find that the plaintiff is "eligible," that is, has substantially prevailed in the lawsuit. The court must then weigh certain equitable criteria to ascertain if the plaintiff is "entitled" to attorney's fees. *See, e.g., Pyramid Lake Paiute Tribe of Indians v. U.S. Department of Justice*, 750 F.2d 117, 119 (D.C.Cir.1984) ["*Pyramid Lake*"]; *Church of Scientology v. Harris*, 653 F.2d 584, 587 (D.C.Cir. 1981) ["*Church of Scientology*"]. Among the criteria considered during the entitlement part of the test are "public benefit,

---

**5.** As a result of GE's release, the NRC agreed to place these eleven pages in its Public Document Room. *See* Br. of Appellants at 7.

**6.** USC's fees for Phase I totalled $1,461.25. *See* Br. of Appellants at 5.

**7.** The attorney's fees for Phase II amounted to $14,998.50. *See* Br. of Appellants at 5. UCS also sought $538.19 in costs and another $1,878.10 for work on its reply brief, bringing the total fees and costs claimed to $18,876.04. *Id.* n. 8.

**8.** Since the parties' briefs have discussed the issues in terms of Phase I and Phase II stages of

litigation, we shall make similar reference. We do so only for the convenience of this Court and the parties. Our employment of the term should not be interpreted as indicating approval or disapproval of bifurcation.

**9.** Section 552(a)(4)(E) provides, in pertinent part:

the court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

commercial benefit to the complainant, nature of the complainant's interest in the records sought and reasonableness of the government's asserted legal basis for withholding." *National Building Maintenance, Inc. v. Sampson,* 559 F.2d 704, 721 (D.C.Cir.1977) [*"National Building Maintenance"*].

In this case, the District Court briefly addressed both the eligibility and entitlement issues, finding in favor of UCS. Memorandum Order and Opinion of October 22, 1985 ("slip op."); J.A. at 148–49. Appellants have raised the following arguments about the propriety of awarding attorney's fees on appeal: First, they argue that UCS is not eligible for Phase I attorney's fees because it failed to demonstrate a causal connection between this lawsuit and the Phase I releases. *See* Br. of Appellants at 23–25. Next, appellants contend that UCS is not eligible for Phase II attorney's fees because it did not substantially prevail when GE released only eleven of 1,500 pages at issue in Phase II. *See* Br. of Appellants at 12–16. Appellants allege further that UCS is not entitled to Phase I attorney's fees because the NRC's withholding of documents was entirely reasonable and because no public interest was benefitted by the Phase I releases. *See* Br. of Appellants at 17–23. Finally, they assert that UCS is not entitled to Phase II attorney's fees both because the NRC's withholding of proprietary information was entirely reasonable and because no public interest was served by release of the eleven pages. *See* Br. of Appellants at 25–26. Before assessing appellants' contentions, we examine briefly the acceptable parameters of this Court's review.

Findings of fact in FOIA cases may be overturned only if they are "clearly erroneous." *Fund for Constitutional Government v. National Archives,* 656 F.2d 856,

871 (D.C.Cir.1981). Whether a plaintiff has demonstrated the requisite eligibility and entitlement in a particular FOIA case is a factual determination within the District Court's province. *Cox v. U.S. Department of Justice,* 601 F.2d 1, 6–7 (D.C.Cir.1979); *Cuneo v. Rumsfeld,* 553 F.2d 1360, 1365–68 (D.C.Cir.1977). This Court must exercise restraint in its review of eligibility and entitlement determinations, disturbing an attorney's fees award decision only when it amounts to an abuse of discretion. *Id.* In light of the foregoing considerations, we discuss next appellants' specific contentions regarding appellee's eligibility for and entitlement to attorney's fees.

1. *Eligibility.* The District Court addressed the issue of UCS's eligibility for attorney's fees as follows:

While it was not necessary to file suit prematurely as was done here, release of the documents to plaintiff was in large part directly and causally related to the filing of this action. Consequently, the Court finds that plaintiff substantially prevailed on its claim for relief.

Slip op. at 1, J.A. at 148.

Appellants assert that UCS is not eligible for Phase I attorney's fees because it cannot demonstrate a causal connection between this lawsuit and the Phase I releases. *See* Br. of Appellants at 23–25. The NRC, relying on the District Court's finding that "it was not necessary to file prematurely," contends that the releases made during Phase I resulted from the normal course of the administrative process, and not from the institution of the lawsuit.[10] The NRC contends that UCS would have re-received the same releases had they waited for the completion of the administrative proceeding.[11] Br. of Appellants at 24.

---

**10.** Prior cases have established that a causal nexus must exist between the action and the agency's release of the information. *See, e.g., Church of Scientology,* 653 F.2d at 588. Further, hasty recourse to litigation has been held to undermine a plaintiff's claim of having substantially prevailed. *See Weisberg v. U.S. Department of Justice,* 745 F.2d 1476 (D.C.Cir.

1984); *Vermont Low Income Advocacy Council, Inc. v. Usery,* 546 F.2d 509, 514–15 (2d Cir.1976).

**11.** During this phase, the NRC released approximately 2,000 partial pages on December 3, 1984. Br. of Appellee at 21. In January, it also prepared a *Vaughn* index for the 1,600 pages of documents that the parties had stipulated to be the subject of the litigation. As a result of its

Appellee claims that this argument fails for two reasons. First, UCS states that the Commission's hypothesis, that the release of the 2000 partial pages is attributable to the administrative process, is not borne out by the record, as evaluated in the lower court's decision. Br. of Appellee at 23. Even assuming that the release can be attributed to the administrative process, UCS believes that it nevertheless "substantially prevailed" in this phase of the litigation because the NRC was forced to scrutinize the withheld documents a second time.[12] *Id.* at 24. Further, UCS claims that it succeeded in forcing the NRC to prepare a *Vaughn* index containing the first useful and detailed description of the withheld portions of the PRA.[13] *Id.* at 24–25.

The second reason that appellee rejects appellants' argument is appellee's belief that the first stage of the litigation prompted the disclosure and discretionary determination obtained in Phase II. Appellee maintains that, although the court may have disapproved of the early filing of the complaint, it nevertheless found that the eventual release of documents was "in large part directly and causally related to the filing of this action." *Id.* at 25, *quoting* slip op. at 1. Appellee argues that this finding is amply supported by the record.[14] Br. of Appellee at 26.

UCS argues further that the cases appellants cite, *Weisberg* and *Vermont Low Income*, are inapposite to this case. Appellee believes that *Weisberg* is not analogous because the plaintiff waited only one day before amending his complaint to include a voluminous FOIA request. In contrast to the *Weisberg* plaintiff, UCS argues that it had waited six months before filing its FOIA complaint, and only did so after it became clear that the NRC had no intention of independently reviewing the validity of GE's proprietary claims. Br. of Appellee at 28. Appellee contends that *Vermont Low Income* has little bearing upon the issues at hand because the result of the litigation there was no different than if the plaintiff had waited for the outcome of an administrative search. Appellee believes, in contrast to *Vermont Low Income*, that the most significant releases in this case were the direct result of its lawsuit. Br. of Appellee at 27.

We find it troubling that both parties are able to raise such convincing but contradictory arguments. Additional factual findings or further explanation must be articulated by the District Court, upon remand, to support its finding that UCS is eligible for Phase I attorney's fees. Specifically, we are troubled by the seemingly inconsistent fashion in which the District Court has acted with respect to the issue of the prematurity of the lawsuit.

The NRC claims that UCS is not eligible for Phase II attorney's fees because it did not substantially prevail when GE released only eleven of 1,500 pages at issue. *See* Br. of Appellants at 12–16. Appellants

---

preparation of the *Vaughn* index, the NRC released an additional 110 partial pages of PRA documents. *Id.*

12. Appellees call attention also to the fact that this lawsuit was filed six months after the NRC reviewed the FOIA request in question. Having released none of the PRA documents to date, the NRC was giving GE a third chance to review its documents and would not advise UCS as to when it could expect a response. Br. of Appellee at 24.

13. The *Vaughn* index resulted in the release of 110 partial pages of information. Appellee alleges that the release of this information cannot be attributed to the administrative process since, without the *Vaughn* index, it would never have been identified. Br. of Appellee at 25.
    These pages included summary results, publicly available information, government-generat-

ed computer codes and methodologies that had not been previously disclosed. *See* Declaration of Mark P. Rubin, February 1, 1985, ¶ 13; J.A. at 95. Appellee contends that this information was of some, albeit limited, use to UCS and the public. Br. of Appellee at 25, *citing* Declaration of Steven C. Sholly, March 18, 1985, ¶ 20 ["Sholly Declaration"], J.A. at 114.

14. In support, UCS points to the fact that the NRC and GE vigorously opposed disclosure until it was clear that the case would proceed to trial. Br. of Appellee at 26. UCS argues that the lawsuit also directly forced the NRC to make and explain a discretionary determination as to whether the public interest required disclosure of the PRA, in spite of its exempt status. *Id.*

note that this Court has recognized that, in determining eligibility, a comparison must be made between the documents at issue in the litigation and the documents received. *See Church of Scientology*, 653 F.2d at 590; *Nuclear Control Institute v. U.S. Nuclear Regulatory Commission*, 595 F.Supp. 923, 926 (D.D.C.1984); *Braintree Electric Light Dept. v. Department of Energy*, 494 F.Supp. 287, 291 (D.D.C.1980) [*"Braintree"*].

UCS claims that the NRC wrongly focuses on the volume of paper sought and released through this litigation, rather than the substantive significance of the releases.[15] Br. of Appellee at 31. They argue that none of the cases cited by the NRC supports the proposition that plaintiff's success in a FOIA action can be reduced to a comparison of the volume of paper released against the volume withheld. *Id.* As to *Braintree*, UCS argues that the plaintiff there sought a voluminous amount of documents of a commercial nature, but received only the names of customers, which were "evidently well known." 494 F.Supp. at 290. Similarly, with respect to *Nuclear Control Institute*, UCS argues that the entire document obtained by the plaintiff was already in the public record. Appellee contends that, in both of these cases, the releases ultimately obtained by the plaintiffs were substantively inconsequential, unlike the releases UCS obtained here.[16] Br. of Appellee at 31.

The NRC argues further that it is not liable for fees because it was not the party that eventually released the documents. Br. of Appellants at 16–17. Appellants' contention is that the necessary causal nexus between the lawsuit and the release of the eleven settlement pages is lacking because the NRC was not prompted by the lawsuit to release documents to UCS. Br. of Appellants at 16. Rather, they assert that the ultimate release of the eleven pages was made solely by GE in a settlement with UCS, without the NRC participating in the settlement negotiation. *Id.* Once GE released the materials that it had previously kept confidential, the NRC believes that it had no choice but to make those materials publicly available. *Id., citing Pyramid Lake*, 750 F.2d at 120. Although the lawsuit may have caused GE to release these pages, appellants note correctly that the FOIA is concerned with government releases, and not third party releases. *Id.* at 16–17.

UCS believes that the NRC's argument, that since GE released the PRA results through settlement, UCS is not entitled to attorney's fees, must fail as a matter of law.[17] *Id.* at 35. Just as the District Court sharply criticized the NRC's failure to make its own independent determinations on the releasability of the PRA, UCS argues that this Court also must reject the Commission's attempt to avoid liability for the disclosure of documents that it resisted

15. UCS argues also that the NRC ignores the fact that the relief obtained included requiring the NRC to make a discretionary determination regarding whether the public interest in disclosure of the PRA outweighed GE's commercial interest in its confidentiality. *Id.* UCS asserts further that the NRC has ignored its longstanding practice of providing PRAs for public review, steadfastly refusing to explain publicly its policy reasons for not releasing the GESSAR–II PRA until forced to do so by this lawsuit. *Id.* UCS believes, if nothing else, it obtained a significant victory in forcing the NRC to comply with its own regulations. *Id., citing Cuneo*, 553 F.2d at 1399.

16. UCS distinguishes its present circumstances from those of *Braintree* and *Nuclear Control Institute* in that the categories of PRA results obtained through the lawsuit were among the results of principal interest to UCS for review of

the GESSAR–II design, for comparison of the GESSAR–II PRA with other PRAs, and for analysis of risk reliability. *Id.* at 31–32, *citing* Fee Petition at 9–10; Sholly Declaration, ¶ 23, J.A. at 116. UCS argues that these categories, while comprising only eleven pages, along with the two other categories previously released voluntarily, constitute almost all of the ten categories of documents specifically identified by UCS in its response to the NRC and GE summary judgment motions. Br. of Appellee at 32.

17. We note that appellee does not cite any law in support of its proposition. Rather UCS relies on the policy argument that, to rule for the NRC on the basis of its passive role, is to encourage the habitual abdication of the Commission's independent statutory role in assessing the validity of claims for commercial information. Br. of Appellee at 35.

so forcefully in reliance on GE's proprietary claims. *Id.*

A court must assess both the substance and quality of the information released. *See, e.g., Des Moines Register and Tribune Co. v. U.S. Department of Justice,* 563 F.Supp. 82, 84 (D.D.C.1983); *Katz v. U.S. Department of Justice,* 498 F.Supp. 177, 185 (S.D.N.Y.1979). Appellee is correct in its statement that sheer volume of release is not determinative. The District Court, on remand, should explain why it believes the release of eleven pages is of such substance and quality as to make UCS eligible for an attorney's fees award. Finally, we are troubled by the lack of explanation in the District Court's opinion as to the effect of the third party settlement upon its finding of attorney's fee eligibility. We urge the District Court to explain, on remand, its position on this issue, and the bearing, if any, of the third party settlement on its finding of eligibility.

2. *Entitlement.* The District Court made the following findings as to UCS's entitlement:

> The litigation served the public interest in a number of respects. The Nuclear Regulatory Commission was required to consider its responsibilities under FOIA independent of the interests of intervenor General Electric Company, a company that is subject to NRC regulation and whose commercial interests previously appear to have dominated NRC's public decisions in this matter. Moreover, release of the documents aided public discussion of nuclear energy policies.

Slip op. at 1; J.A. at 148.

The NRC asserts that UCS is not entitled to Phase I and II fees because the NRC's withholding of documents was entirely reasonable and because the releases served no public interest. Br. of Appellants at 17–23, 25–26. First, the NRC claims that the District Court recognized the reasonableness of the government's withholding of documents that were released in Phase I when it noted that UCS had brought suit prematurely. *Id.* at 26. They argue that these materials were released as soon as the NRC completed its administrative processing. *Id.* As to their proposition that Phase I releases served no public interest, appellants cite a statement written by UCS in support of its summary judgment motion. *Id.*[18]

Appellants raise many challenges to the District Court's finding of Phase II entitlement. First, they contend that the District Court gave no indication that it considered all of the entitlement factors enunciated in *Nationwide Building Maintenance.* Br. of Appellants at 18. In particular, the NRC complains that the court does not discuss the reasonableness of the government's withholding under Exemption 4, of the eleven pages that eventually were released. *Id.* Appellants state that the District Court erred as a matter of law if it was suggesting that the NRC had acted unreasonably by considering GE's commercial interest. They believe that this is so because the commercial interest of the third party is precisely what is considered in reviewing an Exemption 4 proprietary information claim.[19] *Id.* at 19.

Appellants point out that the District Court's earlier, and more expansive, Memorandum in this case recognized that the NRC's withholding was reasonable. *Id., citing* Memorandum, June 6, 1985 at 4–5 ("Memorandum"), J.A. at 128–29. The

---

18. UCS stated in its March 18, 1985 statement of material facts in support of its summary judgment motion that "the material thus far released is so incomplete as to be virtually useless in assessing any of these questions of public importance." J.A. at 104, ¶ 16.

19. Appellants argue that the GE materials that UCS requested were voluminous and highly technical. They claim that they independently and carefully reviewed these documents in light of GE's proprietary claims. *Id.* at 20. The NRC

maintains that it required GE to re-review its materials and to provide written, sworn justifications for its proprietary claims. *Id.* at 21, *citing* J.A. at 50, 144. The NRC then reviewed GE's claims line-by-line and scrutinized them against UCS's competing claims of no competitive harm to GE and waiver. *Id., citing* J.A. at 58, 91. The NRC claims that it ultimately released some materials to UCS when it was not convinced by GE's proprietary claims. *Id., citing* J.A. at 60, 63–64.

NRC points to language in this Memorandum that specifically held that the "NRC acted deliberately only after careful analysis of each paper request and withheld but a select portion for reasons which support that action." *Id., citing* Memorandum at 5, J.A. at 129.

Finally, appellants claim that the court failed to explain exactly what public interest was involved and how that interest justifies a fee award. Although the District Court states that "release of the documents aided public discussion of nuclear energy policies," slip op. at 1; J.A. at 148, appellants claim that the lower court failed to elaborate what public discussion the Phase II's eleven pages might generate and how that discussion would aid nuclear energy policies. Br. of Appellants at 22.[20]

Appellee counters that the District Court opinion contains language bearing directly on the issue of the reasonableness of withholding documents. Br. of Appellee at 36–37. They contend that the District Court found that, as a result of UCS's lawsuit, the NRC was required to consider its responsibilities under FOIA independent of GE's previously dominating interests. Further, appellee argues that, contrary to the Commission's assertion, the District Court did not err in finding that the NRC was required to give independent consideration to its obligations under the FOIA, without being dominated by GE's interests.[21] Br. of Appellee at 37. UCS does not believe that the District Court's fee opinion is inconsistent with its summary judgment memorandum.[22] *Id.* at 38. UCS believes that the Commission's suggestion that UCS could have reviewed the PRA in confidence under a proprietary agreement is misguided.[23]

As to the public interest that was benefitted, UCS points to the fact that it obtained significant disclosures of an important regulatory document that may be used to license numerous nuclear reactors, as well as to make inter-plant design comparisons, develop generic regulatory positions, and give priority to safety issues.[24] *Id.* at 41. Finally, UCS argues that it succeeded in requiring the NRC to make and explain a determination as to whether the public interest mandated disclosure of the GES-

---

20. The Commission believes that the court's public interest conclusions are also undermined by the fact that the Phase II eleven pages were always available for peer review under protective agreements by PRA experts, including UCS. They contend, that although the court accorded this fact substantial weight in upholding the NRC's refusal to release the material as a matter of regulatory discretion, it failed to give any consideration to this fact in its conclusory finding that UCS met the public interest element of an entitlement showing. Br. of Appellants at 23, *citing* Memorandum, June 6, 1985 at 6, J.A. at 130.

21. UCS believes that the Commission deferred repeatedly to the judgment of GE, asking only that GE review and re-review its claim that the GESSAR–II PRA was proprietary. *Id.* During summary judgment proceedings, the NRC backed GE fully, deferring to GE even when it could not verify the accuracy of GE's representation. See Declaration of Mark Rubin, which acknowledged that the NRC did not confirm "GE's claims of their expenditures of resources on the PRA and data base, the uniqueness of the analysis, or the prediction of the PRA's market value." J.A. at 92.

22. UCS argues that the opinion did not address the NRC's complete reliance on GE during the administrative proceeding nor address the reasonableness of NRC's original refusal to make and explain a policy determination regarding discretionary release of the PRA. Br. of Appellee at 38.

23. UCS believes that the availability of the GESSAR–II PRA to a select group that has been sworn to secrecy about its contents hardly serves the FOIA's fundamental purpose "to encourage the maximum feasible public access to public information." Br. of Appellee at 38, *citing Church of Scientology*, 653 F.2d at 590. Nor does UCS believe that access to the PRA under a proprietary agreement serves UCS's purpose of educating the public and encouraging vigorous and widespread debate on the use of probabilistic risk assessments in the NRC's regulatory process. *Id.*

24. UCS contends that, although it did not obtain the entire PRA, it did secure release of some of the most valuable quantitative results for purposes of evaluating the PRA, comparing the GESSAR–II design with other plants, and assessing the NRC's regulatory policies. They believe that the logic of the Commission's position would force parties like UCS to litigate for the entire PRA instead of settling for production within a reasonable time of what it considered most important for analytical purposes. Br. of Appellee at 41–42.

SAR–II PRA regardless of its proprietary status. *Id.* at 42. Appellee maintains that the NRC steadfastly avoided confronting the strong criticism by UCS and its own advisory panel, the ACRS, until it was forced to do so by this litigation. *Id.*

We find that the District Court wrote convincingly, but in insufficient detail, as to the public interest served by this litigation. Specifically, this Court is troubled by the seemingly inconsistent language as to the reasonableness of the NRC's withholding of the PRA in the District Court's Memorandum of June 6, 1985 and its Memorandum Opinion of October 22, 1985. The District Court should, on remand, provide a fuller explanation or further findings assessing the unreasonableness of NRC's withholding.

### III

■ Because the record demonstrates some support for a finding of eligibility and entitlement, a reversal without a remand would be improper. It is the rule of this Circuit that if there is some ambiguity or lack of discussion in the trial court's opinion, it is appropriate to remand to that court for further findings of fact. *See, e.g., Cox,* 601 F.2d at 6; *Constitutional Government,* 656 F.2d at 871; *Nationwide Building Maintenance,* 559 F.2d at 710.

For the foregoing reasons, we remand the grant of attorney's fees to the District Court for further explanation or further findings of fact explaining the inconsistencies in its Memorandum and Memorandum Opinion both as to the prematurity of filing suit and the reasonableness of the NRC in withholding information later released by GE in settlement.

*It is so ordered.*